■ In the Matter of the CITY OF NEW YORK, Respondent, Relative to Acquiring Title to Real Property Within the Area Bounded by Montrose Avenue and Other Streets for a Project to be Known as Lindsay Park Houses, in the Borough of Brooklyn. BLUMA REALTY CORP. et al., Appellants.— In a condemnation proceeding for slum clearance purposes pursuant to a resolution of the Board of Estimate of the City of New York (adopted June 22, 1961), claimant Bluma Realty Corp., as owner, and claimant Josephine Sbeglia, as mortgagee of Damage Parcel 314, appeal from so much of a decree of the Supreme Court, Kings County, entered January 7, 1963 upon the court's oral opinion and written decision after a nonjury trial, as awarded $26,500 to said owner, subject to the mortgage. Decree, insofar as appealed from affirmed on the oral opinion of the Special Term, without costs. Beldock, P. J., Ughetta and Hill, JJ., concur; Kleinfeld and Brennan, JJ., dissent and vote to reverse the decree, insofar as appealed from, and to remit the proceeding to the Special Term for further hearings and the making of an award not inconsistent with the following memorandum: In 1950 a certificate of occupancy for the subject building, which contained 18 apartments and 2 stores, was issued after the building had been renovated. It is undisputed: (1) that in 1957 the parcel was sold to one who was apparently related to the president of the owner claimant corporation, Bluma Realty Corp., for the sum of $55,000; (2) that said purchaser or his family spent $2,171.28 to remove violations and had additional expenses of over $1,300 in connection with the purchase; and (3) that title was taken subject to a mortgage in the sum of about $48,000. While there is evidence in the record which justified the finding that the building was in bad physical condition when title vested in the City of New York on September 15, 1961, nevertheless it was undisputed that there were no violations on record when title so vested and that the balance owing on the mortgage was about $40,000. It is evident that the actual rents paid for the apartments were far in excess of the rents paid in similar buildings in the area which were subject to rent control. But the rents in the building in question were not controlled and therefore they were high for the type of apartments involved, although other reasons apparently entered into the fixation of the high rents, namely: (a) the fact that many of the tenants were receiving public welfare benefits; (b) the fact that the rents included payment for gas and electricity; and (c) the fact that the apartments, or some of them, were furnished in whole or in part. It is evident that, in making an award of $26,500 (the sum given as the value in the appraisal by the city's expert), based on the capitalization of income, the Special Term completely disregarded the actual rents received and the actual expenses of the owner; it felt that the standards to be applied were the rentals and expenses of rent-controlled buildings in the area which were similar in physical construction to the subject building. In our opinion, Special Term rendered its decision on an erroneous theory of law (cf. *Matter of City of N. Y.* [*Lincoln Sq. Slum Clearance Project*], 15 A D 2d 153, affd. as to one damage parcel 12 N Y 2d 1086; *People ex rel. Gale* v. *Tax Comm.*, 17 A D 2d 225; *Matter of City of N. Y.* [*Madison Houses*], 17 A D 2d 317). If the rents in a tenement building are controlled when the building is taken by eminent domain, the controlled rents are the surest guide to a fair estimate of rental value (*Matter of City of N. Y.* [*Lincoln Sq. Slum Clearance Project*], supra). But, under the circumstances shown in the instant case, to disregard the actual decontrolled rents paid in a building in a slum area affected by an urban renewal program, is to disregard the fair value of such a building and to deprive the owner of his property without just compensation (see, e.g., Administrative Code of City of New York, § Y41–1.0).